**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Lyndsi Burchfield, | ) | No. CV 11-00590-PHX-FJM |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| Michael J. Astrue, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |
| | ) | |

We have before us plaintiff's opening brief (doc. 18) and the defendant's response (doc. 19). Plaintiff did not file a reply.

Plaintiff filed an application for supplemental security income on June 6, 2006. Her application was denied by the Social Security Administration ("SSA") initially and upon reconsideration. She requested a hearing before an administrative law judge ("ALJ") and a hearing was held July 29, 2009. The ALJ concluded that plaintiff was not disabled and denied her request for benefits. Relying on a vocational expert, the ALJ found that plaintiff could perform an unskilled job that is simple and repetitive with no public contact, no teamwork, structured supervision, and additional breaks. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

**I**

The alleged onset of plaintiff's disability was August 1, 1994. She was born in 1987 and was nineteen years old as of the date of her application. Plaintiff attended special education classes but graduated high school with a regular diploma. She worked part-time as a grocery bagger for approximately four months and as a shoe stocker at Wal-Mart for approximately four days. She married in September 2007 and started divorce proceedings in December 2008. At the time of the hearing she had a one-year-old daughter and lived with a boyfriend. She spent her time taking care of her daughter, going for walks, playing computer games, and doing light chores.

**II**

We "disturb the denial of benefits only if the decision 'contains legal error or is not supported by substantial evidence.'" Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks and citations omitted). The "evidence must be more than a mere scintilla but not necessarily a preponderance." Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). We must "review the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion." Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ followed the required five-step procedure to evaluate whether plaintiff is disabled within the meaning of the Social Security Act. See 20 C.F.R. § 416.920(a)(4). At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the date of her application. At step two, the ALJ found that plaintiff's developmental delay, borderline intellectual functioning, dependent personality disorder, and overactive bladder were severe impairments. Tr. at 68. Consequently, the ALJ proceeded to step three, where she concluded that plaintiff's impairments did not meet or equal one of the listed

1 impairments in the regulations.  To show that an impairment matches a listed impairment, a claimant "must meet *all* of the specified medical criteria."  Sullivan v. Zebley, 493 U.S. 521, 530, 110 S. Ct. 885, 891 (1990).  If a claimant has an impairment that meets or equals a listed impairment, she is "conclusively presumed to be disabled" regardless of her age, education, or work experience.  Bowen v. Yuckert, 482 U.S. 137, 141, 107 S. Ct. 2287 (1987); Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990); 20 C.F.R. § 416.920(a)(4)(iii).  Because the ALJ found plaintiff did not meet or equal a listed impairment, she assessed plaintiff's residual functional capacity and past relevant work at step four.  Finally, at step five, the ALJ considered plaintiff's residual functional capacity, age, education, and work experience and determined plaintiff is not disabled because she could perform other work.

**III**

Plaintiff contends that she meets the requirements of mental retardation in Listing 12.05, and thus the ALJ erred at step three.

> Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria, [the Commissioner] will find that [the claimant's] impairment meets the listing.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A) (emphasis added).

The introductory paragraph defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning" beginning before age 22.  Id. § 12.05.  This diagnostic description is separated from the specific criteria measuring the severity of the mental impairment.  See 20 C.F.R. § 416.925(c)(3) ("We will find that your impairment(s) meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement . . . .").  The relevant severity prong requires a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05(C).  When more than one score is derived from an IQ test, the lowest score is used.

- 3 -

Id. § 12.00(D)(6)(c).  Therefore, in order to meet the requirements of Listing 12.05C, a claimant must (1) satisfy the diagnostic description of mental retardation, (2) meet the duration requirement, (3) have a valid verbal, performance, or full scale IQ of 60 through 70, and (4) have a physical or mental impairment which imposes an additional and significant work-related limitation of function.  See, e.g., Randall v. Astrue, 570 F.3d 651, 659-60 (5th Cir. 2009) (construing Listing 12.05 as requiring claimants to satisfy the diagnostic description's substantive requirements independently of the severity criteria); Brooks v. Barnhart, 167 F. App'x 598, 600 (9th Cir. 2006) (finding IQ scores were likely invalid but noting that "[i]n any event, the scores, alone, are insufficient to establish a severe impairment" and record did not show significantly subaverage intellectual functioning).

The ALJ did not analyze the requirements of the introductory language, and the defendant fails to support his claim that plaintiff does not meet the capsule definition. Plaintiff's IQ scores and school records provide evidence of significant subaverage general intellectual functioning.[1]  Adaptive functioning is not easily determined, though, because the regulations do not define this term.  When promulgating the mental retardation regulations, the SSA specifically considered and rejected the definitions used by leading professional organizations. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,018, 20,022 (Apr. 24, 2002).  The Commissioner noted the "method of measuring the required deficits in adaptive functioning differ[s] among the organizations" and stated that the agency's definition allows "use of any of the measurement methods recognized and endorsed by the professional organizations."  Id.

According to the DSM–IV–TR, adaptive functioning "refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural

---

[1] "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. text rev. 2000) ("DSM–IV–TR").

- 4 -

1 background, and community setting." DSM-IV-TR at 42. Deficits in adaptive functioning
2 are shown by "significant limitations . . . in at least two of the following skill areas:
3 communication, self-care, home living, social/interpersonal skills, use of community
4 resources, self-direction, functional academic skills, work, leisure, health, and safety." Id.
5 at 41. The United States Supreme Court cited an earlier version of the DSM when it defined
6 adaptive functioning as "the person's effectiveness in areas such as social skills,
7 communication, and daily living skills, and how well the person meets the standards of
8 personal independence and social responsibility expected of his or her age by his or her
9 cultural group." Heller v. Doe, 509 U.S. 312, 329, 113 S. Ct. 2637, 2647 (1993) (quoting
10 Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 28-29 (3d rev.
11 ed. 1987)).

12 "Impairments in adaptive functioning, rather than a low IQ, are usually the presenting
13 symptoms in individuals with Mental Retardation." DSM-IV-TR at 42. "Problems in
14 adaptation are more likely to improve with remedial efforts than is the cognitive IQ, which
15 tends to remain a more stable attribute." Id. Therefore, a valid IQ score below 70 is not
16 enough, standing alone, to diagnose mental retardation. Id. While discussing the Listing
17 12.05D criteria, the ALJ said that plaintiff has some restrictions in her social functioning and
18 activities of daily living, but they do not rise to the level of marked. There is no indication
19 whether they are significant limitations, as required by the DSM-IV-TR definition. It is
20 unclear which organization's measurement method, if any, the ALJ used to assess whether
21 plaintiff has "deficits in adaptive functioning." As a result, the ALJ failed to comply with
22 the SSA's directive to measure adaptive functioning by one of the methods recognized and
23 endorsed by the professional organizations.

24 The ALJ decided the criteria of Listing 12.05C were not met because plaintiff's recent
25 IQ scores were invalid. Tr. at 71-72. In June 2007, Dr. House administered an IQ test to
26 plaintiff which resulted in a verbal score of 68, a performance score of 74, and a full scale
27 score of 68. Dr. House stated that these scores underestimated her actual ability, however,
28 because she refused to answer several questions. Tr. at 358, 360. He also stated that her

1  language skills are not as impaired as her verbal IQ score would suggest and her performance
2  on a visual-motor skills test suggested a higher level of functioning than her performance IQ
3  score implied. Tr. at 357, 362. Plaintiff claims that Dr. House did not specifically make a
4  finding of invalidity and so the ALJ's determination is based on a misinterpretation.

5  An ALJ can decide that an IQ score is invalid. Thresher v. Astrue, 283 F. App'x 473,
6  475 (9th Cir. 2008); Lax v. Astrue, 489 F.3d 1080, 1087 (10th Cir. 2007). Evidence that a
7  claimant did not make a serious effort in testing may properly be considered when
8  determining the validity of an IQ score. Here, Dr. House reported that he "believe[d] that
9  some of these test scores do underestimate her actual level of functioning" because she
10 tended to give up if she was unsure. Tr. at 358. He did not have time to review plaintiff's
11 school records, but thought it would be helpful to obtain them to see if they were consistent
12 with her math test results. Tr. at 357, 361.

13 "[S]ince the results of intelligence tests are only part of the overall assessment, the
14 narrative report that accompanies the test results should comment on whether the IQ scores
15 are considered valid and consistent with the developmental history and the degree of
16 functional limitation." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(D)(6)(a). Dr. House
17 opined that plaintiff's language skills were not as impaired as the verbal IQ would suggest,
18 and her writing skills suggested a somewhat higher level of functioning than her spelling
19 score on the Wide Range Achievement Test - Revision 3 might imply. He also stated that
20 "[h]er language and social skills as well as her general level of awareness suggested
21 borderline intellectual functioning" rather than mental retardation. Tr. at 357.

22 Plaintiff claims that previous psychological tests resulted in IQ scores which are
23 sufficient to satisfy the Listing's requirements. The ALJ was aware of her previous tests, as
24 she cited a score of 77 from a Stanford-Binet Intelligence Scale, 4th Edition test in 2000. Tr.
25 at 73. However, 77 was plaintiff's verbal component and 68 was her composite score. Tr.
26 at 458. A contemporaneous evaluation stated that the most accurate estimate of plaintiff's
27 academic potential was 77, because there was a significant discrepancy between her ability
28 and achievement, but the same report also stated that "the results of the present testing and

- 6 -

1  evaluation procedures appear to be valid." Tr. at. 458-59.

2  Plaintiff had at least two other IQ tests conducted while she was in school. In 1997, plaintiff obtained scores of 69, 74, and 69 on verbal, performance, and full scale IQ tests, respectively. Tr. at 457. At the time, she was diagnosed with mild mental retardation. Id. After her tests in 2000, the examiner remarked upon plaintiff's significant gains in the verbal areas and reclassified her as specific learning disabled. Tr. at 463. In 2003, plaintiff was retested and scored 63, 72, and 65, with a true full scale IQ having a 90% likelihood of being within the range of 62 to 71. Tr. at 468. Plaintiff was again classified as mildly mentally retarded. While the ALJ notes that plaintiff's special education determination was changed from mild mental retardation to a specific learning disability in 2000, no mention is made that plaintiff was again classified as mildly mentally retarded in 2003. Tr. at 73, 468. The ALJ did not make a specific finding of invalidity for the 2000 scores and did not discuss the scores from 1997 or 2003. The defendant also failed to mention any of plaintiff's IQ tests other than Dr. House's 2007 assessment.

15  Plaintiff correctly points out that, in the absence of evidence of a change in intellectual functioning, many courts presume a person's IQ remains relatively constant. E.g., Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001); Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir. 2001). These cases are distinguishable because they address whether an impairment existed before age 22 based on post-developmental IQ scores. Here, there is no doubt that impairments manifested themselves during plaintiff's developmental period. The SSA's regulations give us reason to question whether such a presumption should apply to scores obtained before age 22. "Generally, the results of IQ tests tend to stabilize by the age of 16." 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(D)(10). But IQ test results obtained between ages 7 and 16 should be considered current for only two years when the IQ is 40 or above. Id. Plaintiff's three school-age IQ tests were all conducted when she was between 7 and 16 years old. While we do not use this regulation to evaluate plaintiff's claim, because she is now over 18, the significance of IQ tests during the developmental period does not change simply because the claimant is an adult. The plaintiff, defendant, and the ALJ fail

1   to discuss the implication of this regulation on the weight to be given to plaintiff's earlier
2   tests.

### IV

4   The ALJ correctly decided that plaintiff's other claimed impairments, overactive
5   bladder and depression, do not merit a finding of disability. There is substantial evidence in
6   the record to support the ALJ's finding that plaintiff's bladder problem is not as significant
7   as alleged. She was not receiving treatment for the condition at the time of the hearing, did
8   not see a urologist until May 2008, and did not follow up with recommended treatment and
9   testing. "[E]vidence of 'conservative treatment' is sufficient to discount a claimant's
10  testimony regarding severity of an impairment." Parra v. Astrue, 481 F.3d 742, 751 (9th Cir.
11  2007). Thus, a complete lack of treatment provides substantial evidence to support a denial
12  of disability benefits. Similarly, medication has mitigated plaintiff's depressive symptoms
13  without causing side effects. Because her depression is controlled by medication, the ALJ
14  did not err in finding that plaintiff's depression was not disabling.

### V

16  The ALJ did not address the validity of plaintiff's 1997 or 2003 IQ scores or the
17  weight to be accorded to any of her pre-2007 tests. Nor did the ALJ analyze the element of
18  "deficits in adaptive functioning" found in the capsule definition of mental retardation. And,
19  she was silent on the second prong of Listing 12.05C.

20  The ALJ must examine the other IQ scores to determine whether they are sufficient
21  to satisfy Listing 12.05C. She must also determine whether her finding in favor of plaintiff
22  at step two is sufficient to satisfy the second prong of Listing 12.05C, i.e., "a physical or
23  other mental impairment imposing an additional and significant work-related limitation of
24  function." If she finds that the scores and step two finding are sufficient, she must then
25  determine whether the "deficits in adaptive functioning" are sufficient to satisfy the
26  introductory paragraph to Listing 12.05. Because we find no error in the ALJ's findings at
27  steps four and five, the remand is limited to step three.

28  Accordingly, we reverse the decision of the Commissioner and remand for rehearing

or reconsideration under sentence 4 of 42 U.S.C. § 405(g). The clerk shall enter final judgment.

DATED this 30th day of November, 2011.

*Frederick J. Martone*
Frederick J. Martone
United States District Judge